Filed 4/20/16  P. v. Salgado CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> HIGINIO SORIANO SALGADO, <br><br> Defendant and Appellant. | D066335 <br><br><br> (Super. Ct. No. SCD247657) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Higinio Soriano Salgado guilty of second degree murder (Pen. Code, § 187, subd. (a)) in the brutal beating death of his employer, architect Graham Downes.[1] The trial court sentenced Salgado to a prison term of 15 years to life.

Salgado contends (1) insufficient evidence supports a finding that he was conscious during the killing or that he acted with malice; (2) the trial court erred in declining Salgado's request to amplify the jury instruction on unconsciousness due to voluntary intoxication (CALCRIM No. 626) with a pinpoint instruction stating that blackouts may cause unconsciousness; (3) the trial court prejudicially erred in admitting testimony from a witness about Salgado's history of drinking; and (4) the prosecutor committed prejudicial misconduct during closing argument by the way in which she characterized involuntary manslaughter due to unconsciousness caused by voluntary intoxication. As we will explain, we conclude that Salgado's arguments lack merit, and accordingly we affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

Salgado worked for several years as a property and construction manager at Downes's architectural firm and related businesses.

On the evening of April 18, 2013, a happy hour was held in the workplace, starting at around 6:00 p.m., with Downes and Salgado in attendance. Salgado drank beer or wine and at least four shots of tequila during the happy hour. Later in the evening,

---

[1]      Unless otherwise indicated, all further statutory references are to the Penal Code.

Downes and five employees — including Salgado — drove to a bar to continue socializing.  While at the bar, Salgado had at least two other drinks, and was described as acting loud, animated and appearing inebriated.  Based on his observations of Salgado's intoxication, the bartender eventually told Salgado that he was not going to serve him any more alcohol.

At around 11:30 p.m., the group decided to move to Downes's house, where Downes served drinks, and Salgado continued drinking.  At Downes's house, Salgado did several things that made some of his coworkers uncomfortable, including antagonizing Downes's dog, making rude comments about something he saw on a coworker's cell phone, invading the personal space of one of the women, and then following two of the women upstairs and opening a closed bathroom door while one of them was using the toilet.  At one point, Salgado got agitated and upset when someone mentioned a former coworker and supervisor of Salgado who had come into the office for a meeting with Downes earlier that week, and whom Salgado did not like.  Salgado raised his voice and pointed at Downes, stating something such as, "Why are you meeting with that guy"; "Fuck that guy"; "You better not give him my fucking job."  Downes reacted in a relaxed and calm manner, successfully defusing the situation by laughing it off and telling Salgado that he was not going to give the person a job.

The last two coworkers left Downes's house and got into their car to leave around 1:00 a.m., without first saying goodbye to Downes and Salgado.  As the women were preparing to drive away, Downes and Salgado came outside to say that they should stay longer.  When the women said they were leaving, Downes asked if they could give

3

Salgado a ride home, but the women declined and drove away. During his interactions with his coworkers at Downes's house and outside while the women were leaving, Salgado appeared drunk but was aware of what he was saying, and he could walk, talk and stand on his own.

A short time later Jeff Kunitz, who lived across the street from Downes, was awakened by loud voices outside his window. He looked outside and saw two men and one woman talking on the sidewalk and then watched the woman walk away down the street. In the context of other evidence presented at trial, there is no dispute that the two men were Salgado and Downes.[2]

Kunitz tried to go back to sleep, but the voices of Salgado and Downes got louder and turned into an argument, so Kunitz went to the window again. He observed that the altercation began to turn physical, with Salgado grabbing and punching Downes, while Downes tried to back off. Kunitz then went outside with a flashlight, which he pointed toward the men. At that point, Kunitz saw Salgado leaning over Downes, who was on the ground. Salgado appeared to have his hands around Downes's upper body and to be pounding him into the ground. Kunitz heard a gurgling sound come from Downes while Salgado was on top of him and saw no more movement from Downes after that point.

---

[2] Among other things, Kunitz described the aggressor during the assault as a man wearing a blue shirt, and Salgado was wearing a blue shirt that evening. As the police eventually found both men on the sidewalk after the assault, with Downes badly beaten and Salgado splattered with blood, Salgado does not attempt to dispute that he was the person that Kunitz observed assaulting Downes.

4

After yelling to the men that he was going to call the police, Kunitz went inside and called 911 at 1:08 a.m. Kunitz then looked out and saw Salgado shaking Downes and dragging him down the street, after which Salgado sat down near Downes and waited. Because the police had not arrived after several minutes, Kunitz decided to go to his garage and shine the headlights to his car onto Salgado and Downes. He saw one man on the ground and the other sitting nearby. Kunitz drove around the block, and then called 911 for a second time at 1:48 a.m. A police officer arrived at approximately 1:50 a.m.

In addition to Kunitz's eyewitness account of the assault, a woman who lived nearby testified about sounds that she heard as she lay in bed that night. Specifically, the woman testified that she was awakened after midnight by a loud male voice saying something such as "I'm going to fuck you up." She then heard loud grunting sounds that went on for a while, along with a persistent soft thumping sound, which was followed by a man's voice saying, "I'm going to call the cops."

The police officer who arrived on the scene at 1:50 a.m. observed Salgado and Downes lying close to each other on the sidewalk. Salgado had his arm across Downes's back. Downes's jaw was locked open, his teeth were bloodied, his face was swollen and he had trauma to his neck. Downes was unresponsive, and the officer called for the paramedics. There were splatters of Downes's blood on the sidewalk and the bushes, along with multiple blood stains on the sidewalk suggesting repeated contact of a bloody object on that surface.

5

When the police officer asked Salgado to sit up, Salgado rolled toward him but was unable to sit up. The officer handcuffed Salgado, helped him to his feet and then walked with him to the patrol car, where Salgado stood for approximately 30 minutes while the officer spoke with him. According to the officer, Salgado appeared to have been drinking, but he was able to function and did not seem to be extremely intoxicated. Aside from a bruise or abrasion between his eyes and marks from the handcuffs, Salgado was not injured. Salgado, did however, have blood splatters on his face and blood on his hands, which was likely Downes's blood. Salgado was eventually transported to the police station and then to jail. His blood alcohol level at 5:20 a.m. was 0.15 percent. According to expert testimony, Salgado's blood alcohol level could have been as high as 0.24 percent at 1:00 a.m.

When paramedics arrived on the scene, Downes had no pulse and wasn't breathing. The paramedics managed to restart Downes's pulse and then transported him to the hospital, but Downes was declared brain dead two days after the assault, on April 21, 2013. An autopsy showed that the cause of death was blunt force trauma to the head and neck that caused brain damage from a lack of oxygen. Downes sustained 17 to 21 blunt force injuries to his head and neck, and there was hemorrhaging in Downes's neck muscles, consistent with strangulation.

Salgado was charged with first degree murder (§ 187, subd. (a)). At trial, Salgado testified that he remembered being in the bar, had a vague memory of driving to Downes's house and could remember a single scene of sitting at the wet bar while Downes was serving drinks, but he had no other memory of what happened at Downes's

6

house and no memory of killing Downes. According to Salgado, the first thing he remembers is being on the sidewalk with the police officer waking him up and Downes lying next to him. Salgado testified that there were incidents in the past where he woke up after a night of drinking and did not remember what happened.

At trial, Salgado's main defense was that he was unconscious due to an alcoholic blackout during the killing, and that due to Salgado's unconscious state, he was guilty of nothing more than involuntary manslaughter. The principal evidentiary support for this defense was the testimony of the defense's expert witness, Dr. Clark Smith, who testified that alcoholic blackouts, which may occur at a blood alcohol level of 0.20 and higher, are a "form of unconsciousness," and persons in such a state "make choices, but usually at an automatic level based on repetitive, learned behaviors."

Disputing Dr. Smith's characterization of an alcoholic blackout, the prosecution's expert witness, Dr. Sean Evans, testified that "[a]n alcoholic blackout is different and distinct from unconsciousness," and that "[a]n alcoholic blackout does not imply any reduction in cognitive capacity, other than not laying down the memory." According to Dr. Evans, an unconscious person will look like someone who is asleep, whereas a person in an alcoholic blackout will lose the ability to lay down a new memory but may otherwise be able to do very complicated things, make conscious decisions and interact fairly normally with the people around them. An unconscious person would not be able to beat someone to death over the course of several minutes, have a coherent conversation, or engage in a prolonged verbal confrontation.

7

The jury found Salgado guilty of second degree murder, and the trial court sentenced him to 15 years to life in prison.

## II.

## DISCUSSION

A.     *Substantial Evidence Supports the Verdict*

Salgado raises two challenges to the sufficiency of the evidence.  First, he argues that the evidence was insufficient to support a finding that he was conscious during the killing.  Second, he argues that the evidence was insufficient to support a finding that he acted with malice.

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . .  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . .  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . .  'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60, citations omitted.)

1.    *Substantial Evidence Supports a Finding That Salgado Was Conscious During the Killing*

As we have explained, Salgado's main defense centered on the claim that he was *unconscious* during the killing due to voluntary intoxication.  As the law provides, if Salgado succeeded in that defense, he would be guilty of no more than involuntary manslaughter.  Specifically, " '[u]nconsciousness is ordinarily a complete defense to a charge of criminal homicide.  ([]§ 26, subd. [Four].)  If the state of unconsciousness results from intoxication voluntarily induced, however, it is not a complete defense. . . . [I]f the intoxication is voluntarily induced, it can never excuse homicide.  [Citation.] Thus, the requisite element of criminal negligence is deemed to exist irrespective of unconsciousness, and a defendant stands guilty of involuntary manslaughter if he voluntarily procured his own intoxication.' "  (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.)  Put simply, " '[w]hen a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter.' " (*People v. Haley* (2004) 34 Cal.4th 283, 313 (*Haley*).)

There is a "judicially created presumption that a person who acts conscious is conscious" (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1317), and "[a] defendant can overcome the presumption . . . by simply producing sufficient evidence to raise a reasonable doubt that he or she was conscious when he or she acted during the commission of the alleged crime." (*Id.* at p. 1318.)  Ultimately, "[t]he prosecution has the burden of proving beyond a reasonable doubt that [the] defendant was conscious during

9

the commission of the crime." (*People v. Cruz* (1978) 83 Cal.App.3d 308, 330-331; accord, *People v. Babbitt* (1988) 45 Cal.3d 660, 693.) Here, the trial court apparently concluded that Salgado had produced sufficient evidence to create a reasonable doubt that he was conscious during the killing and to rebut the presumption of consciousness, and thus the trial court instructed the jury with CALCRIM No. 626 that the People had "the burden of proving beyond a reasonable doubt that [Salgado] was not unconscious."

Salgado contends that insufficient evidence supports a finding that he was conscious. As we will explain, we disagree.

Although no statute defines what it means to be unconscious, case law establishes that for purposes of a crime committed while unconscious, "a person is deemed 'unconscious' if he or she committed the act *without being conscious thereof*" (*Haley*, *supra*, 34 Cal.4th at p. 313, italics added) and when the person's acts "cannot be deemed volitional" (*People v. Sedeno* (1974) 10 Cal.3d 703, 717). Case law has explained that a state of unconsciousness may be caused by, among other things, "somnambulism, a blow on the head, or similar cause." (*Ibid*.)

As Salgado stresses, a person in an unconscious state "need not be incapable of movement." (*People v. Abilez* (2007) 41 Cal.4th 472, 516.) Thus, "[u]nconsciousness does not mean that the actor lies still and unresponsive . . ." (*Haley*, *supra*, 34 Cal.4th at p. 313), and "unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417 (*Halvorsen*).)

10

As Salgado correctly observes, evidence of a defendant's consciousness during a killing "could involve evidence of defendant's behavior at the time of the homicide inconsistent with one who is unconscious." Thus, for instance, in *Halvorsen*, our Supreme Court determined that because of the defendant's "actions during the course of the offenses," including "[t]he complicated and purposive nature of his conduct," the evidence did not support an inference that the defendant was unconscious while he committed the crimes. (*Halvorsen*, *supra*, 42 Cal.4th at p. 418.)

Here, the undisputed evidence showed that Salgado engaged in prolonged activity during his confrontation with Downes. As Kunitz described, the men began by talking to each other, and that talking eventually turned into arguing. Salgado then physically assaulted Downes in a variety of ways, namely punching him, strangling him and repeatedly pounding his head into the ground. Salgado next dragged Downes along the sidewalk and also shook him. A reasonable juror could conclude that the extent of these activities by Salgado are inconsistent with someone in an unconscious state who is not aware of their actions and is not acting with any volition, and therefore Salgado was conscious while killing Downes. Indeed, such a conclusion is directly supported by the testimony of the People's expert witness, Dr. Evans, who stated that a person who is unconscious could not engage in a coherent conversation or a prolonged argument, and could not beat someone to death or drag and shake the victim.

A finding that Salgado was conscious during the killing is also supported by the testimony of people who interacted with him shortly before and shortly after the killing. One of the women who interacted with Salgado outside Downes's house right before she

11

drove away at approximately 1:00 a.m., stated that although Salgado appeared drunk, he could walk, talk and stand on his own. The police officer who arrived on the scene at 1:50 a.m. stated that Salgado was able to function and did not seem to be extremely intoxicated.

Salgado's main argument in support of his claim of unconsciousness is (1) he had a blood alcohol level high enough to cause an alcoholic blackout; (2) he did not remember anything about the killing; and (3) Dr. Smith testified that an alcoholic blackout is a type of unconsciousness. Salgado contends that the *only* permissible conclusion from that evidence is that he was in a state of unconsciousness during the killing. Salgado's reasoning is specious. First, the jury could have simply *disbelieved* Salgado's claim that he had no memory of the killing and was in an alcoholic blackout, given Salgado's strong incentive to try to avoid a murder conviction. Second, even if it credited Salgado's claim that he did not remember the killing, the jury could have relied on testimony of the People's expert, Dr. Evans, rather than the testimony of the defense's expert, Dr. Smith, to determine that the fact of Salgado's alcoholic blackout did not establish that Salgado killed Downes while unconscious. Specifically, it is the role of the jury to make a determination on witness credibility (*People v. Smith* (2005) 37 Cal.4th 733, 739), and " 'the jury remains free to reject [the expert testimony] entirely after considering the expert's opinion, reasons, qualifications, and credibility.' " (*People v. Wright* (1988) 45 Cal.3d 1126, 1142, italics deleted (*Wright*).) Accordingly, the jury could have rejected Dr. Smith's opinion and instead based its verdict on Dr. Evan's opinion that an alcoholic blackout is different and distinct from unconsciousness.

12

In sum, we conclude that substantial evidence supports a finding that Salgado was conscious during the killing, despite his blood alcohol level and his claim that he did not remember committing the crime.

2. *Substantial Evidence Supports a Finding That Salgado Acted with Malice*

Salgado's second challenge to the sufficiency of the evidence is to the element of malice aforethought necessary for murder.

" 'Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.' (§ 187, subd. (a).) Malice aforethought may be express or implied. (§ 188.) 'Express malice is an intent to kill. . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 941-942.) The jury was instructed under CALCRIM No. 520 that it was required to find either express or implied malice to convict Salgado of murder.

Salgado's argument as to the insufficiency of the evidence of malice is premised on a faulty assumption. Specifically, Salgado assumes that the only possible basis for the jury's finding of malice was that Salgado willfully performed an act that he knew posed a danger to human life by voluntarily intoxicating himself, when he knew he would get violent and out of control when drunk. Basing his argument on this assumption, Salgado proceeds to explain that the record contains insufficient evidence that he *knew* that he

13

would become violent and homicidal if he became intoxicated.[3] Specifically, Salgado argues that "[t]here was nothing in appellant's past experience to put him on notice that his drinking would result in a deadly, violent act" and thus "[t]he evidence cannot sustain appellant's conviction for second degree murder."

Salgado's argument fails because it ignores the more obvious theory of implied malice upon which the prosecution focused its case. Specifically, the prosecutor's main theory of implied malice was that Salgado was conscious when he beat and strangled Downes, willfully inflicting an injury that was inherently dangerous to human life.

Completely overlooking this theory of implied malice, Salgado inexplicably contends that "[t]here was no evidence from the night of the incident which illustrated that appellant acted deliberately with conscious disregard for life . . . ." Here, however, the details of the brutal beating that Salgado inflicted upon Downes are more than sufficient to support a finding that Salgado knowingly acted with deliberate disregard for human life. A reasonable juror could conclude that by strangling Downes and pounding Downes's head into the pavement numerous times, Salgado willfully performed acts, the natural and probable consequences of which are dangerous to human life. Indeed, based on the injuries that Salgado inflicted on Downes, substantial evidence supports a finding

---

3     The prosecutor very briefly implied this theory during her closing argument, stating that despite being told that "when you drink you get out of control," Salgado "did it anyway" and then "did an act dangerous to human life over and over again," referring to the sustained beating of Downes. From the context of her remarks, it is not clear whether the prosecutor was developing a theory of implied malice or was simply reinforcing that voluntary intoxication is not a defense to second degree murder.

14

of *express* malice, in that a reasonable juror could conclude that Salgado intended to *kill* Downes, not just seriously injury him.  (*People v. Cain* (1995) 10 Cal.4th 1, 40 ["the nature of the [victims'] wounds, multiple blows to the head and body, supports an inference their assailant intended to kill them"].)  In short, someone who strangles a victim and repeatedly pounds his head against the pavement can reasonably be found to have acted with malice aforethought.

B.      *The Trial Court Did Not Err in Refusing to Amplify CALCRIM No. 626*

We next consider Salgado's contention that the trial court erred by not including a pinpoint instruction regarding blackouts in the jury instruction on unconsciousness due to voluntary intoxication.

While discussing proposed jury instructions, the trial court rejected defense counsel's request that that CALCRIM No. 626 be amplified to include a phrase from CALCRIM No. 3425, identifying a " blackout" as one possible cause of unconsciousness.

Specifically, CALCRIM No. 626, entitled "Voluntary Intoxication Causing Unconsciousness:  Effects on Homicide Crimes," was given to the jury as follows:

> "Voluntary intoxication may cause a person to be unconscious of his or her actions.  A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions.
>
> "A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.
>
> "When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life.  If someone

15

dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter.

"Involuntary manslaughter has been proved if you find beyond a reasonable doubt that:

"1. The defendant killed without legal justification or excuse;

"2. The defendant did not act with the intent to kill;

"3. The defendant did not act with a conscious disregard for human life;

"AND

"4. As a result of voluntary intoxication, the defendant was not conscious of (his) actions or the nature of those actions.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of murder or voluntary manslaughter."

Defense counsel proposed that the instruction be amplified to add a phrase from the general instruction on unconsciousness, CALCRIM No. 3425. That instruction provides:

> "The defendant is not guilty of _____ *<insert crime[s]>* if (he/she) acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. [Someone may be unconscious even though able to move.]
>
> "Unconsciousness may be caused by (a blackout[,]/ [or] an epileptic seizure[,]/ [or] involuntary intoxication[,]/ [or] _____ *<insert a similar condition>*).
>
> "[The defense of unconsciousness may not be based on voluntary intoxication.]
>
> "The People must prove beyond a reasonable doubt that the defendant was conscious when (he/she) acted. If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) were conscious, you should conclude

16

that (he/she) was conscious, unless based on all the evidence, you have a reasonable doubt that (he/she) was conscious, in which case you must find (him/her) not guilty."

Defense counsel proposed that the trial court amplify CALCRIM No. 626 by specifically adding the phrase in the second paragraph of CALCRIM No. 3425, which states that unconsciousness may be caused by a blackout. The trial court denied the request, which Salgado now argues constituted prejudicial error.

" ' "[I]n appropriate circumstances" a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case. . . . [Citations.] But a trial court need not give a pinpoint instruction if it is argumentative . . . .' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 500.) A court may properly "refuse instructions that highlight ' "specific evidence as such" ' because such an instruction " 'invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence,' it is considered 'argumentative' and therefore should not be given." (*People v. Earp* (1999) 20 Cal.4th 826, 886 (*Earp*).)

As specifically relevant here, our Supreme Court has explained that "an instruction incorporating a particular expert's opinion would deprive the jury of its independence in judging the weight to be given to such expert opinion," and is accordingly an improperly argumentative pinpoint instruction. (*Wright*, *supra*, 45 Cal.3d at p. 1143.) As we have explained, Salgado's expert witness, Dr. Smith, testified that an alcoholic blackout *is* a type of unconsciousness, but the People's expert witness, Dr. Evans, testified that an alcoholic blackout *is different and distinct from* unconsciousness. Thus, in light of the conflicting expert testimony on the effect of an alcoholic blackout on a person's

17

consciousness, a pinpoint instruction specifying that a blackout may cause

unconsciousness would have been impermissibly argumentative because it would have

invited the jury to draw an inference in favor of Salgado on the disputed issue of whether

an alcoholic blackout is a type of unconsciousness. That type of determination is

properly left to the jury and is not properly included in a pinpoint jury instruction.[4]

Therefore, the trial court did not err in refusing defense counsel's proposed amplification

of the definition of unconsciousness in CALCRIM No. 626.

C.     *The Trial Court Did Not Prejudicially Err in Admitting Testimony of a Previous*
       *Incident When Salgado Was Out of Control After Drinking Alcohol*

Salgado's next contention is that the trial court prejudicially erred in admitting

certain testimony from a witness who briefly described a past experience involving

Salgado's consumption of alcohol.

Roger Ndundalulengo was a coworker of Salgado, who also rented his converted

garage to Salgado as his residence. During the People's rebuttal case, the prosecutor

---

[4]     We note also that although Salgado relied on the reference to a "blackout" in
CALCRIM No. 3425 as authority for instructing the jury that a blackout can cause
unconsciousness, the authority cited in CALCRIM No. 3425 reveals that the type of
"blackout" described in CALCRIM No. 3425 might not be an *alcoholic* blackout.
Specifically, in support of the reference to a blackout as a possible cause of
unconsciousness, the authority section following CALCRIM No. 3425 cites only *People
v. Cox* (1944) 67 Cal.App.2d 166, 172. (2 Judicial Council of Cal., Crim. Jury Instns.
(2015) Authority for CALCRIM No. 3425, p. 938.) *Cox* concerned an incident in which
the defendant was hit on the head with a bottle and may have suffered a brain injury
resulting in "automatism, and that while in such unconscious condition he committed an
act without being conscious thereof." (*Cox*, at p. 172.) As *Cox* did not involve a
blackout caused by alcohol, it does not provide legal support for a pinpoint instruction
that the condition commonly referred to as "an alcoholic blackout" can be a cause of
unconsciousness.

asked Ndundalulengo about an incident during which Salgado was drinking and was out of control, which occurred in February or March 2013.

"Q: And there was an incident one night where the defendant had been drinking and was out of control; is that right?

"A: Yes.

"Q: And the next morning, you spoke with the defendant; is that correct?

"A: Yes.

"Q: And you told him about his conduct the night before; is that correct?

"A: Yes.

"Q: Did he tell you that he did not know what happened the night before?

"A: Yes.

"Q: Did you tell him to stop drinking alcohol?

"A: Yes.

"Q: And did you tell him if he did not stop drinking alcohol, you would kick him off your property?

"A: Yes."

Salgado contends that this testimony was improperly admitted because it was not relevant and prevented him from receiving a fair trial.

As there was no objection during Ndundalulengo's testimony, the first issue we consider is whether Salgado's evidentiary objection has been preserved for appeal. Examining that issue requires a review of two conversations that counsel had with the trial court prior to the relevant testimony.

19

First, during a sidebar with the trial court in the middle of Salgado's testimony, the prosecutor notified the court that she intended to ask Salgado about his history of drinking, and that she then intended to call Ndundalulengo in rebuttal to testify that he told Salgado to stop drinking because Salgado had a history of being violent or angry when drunk and of having blackouts. Defense counsel argued that Ndundalulengo should not be permitted to testify about any history of anger or violence by Salgado when drinking because, as he understood the facts, Ndundalulengo did not *personally* see any such behavior. The prosecutor stated that she wanted to focus on Salgado's history of blackouts and on Ndundalulengo telling Salgado to stop drinking, not on Salgado's history of anger or violence when drinking. The trial court ruled that it would allow questioning of the limited nature described by the prosecutor.

Salgado's testimony then resumed, during which the prosecutor asked Salgado about his history of drinking, including his relevant interactions with Ndundalulengo. Salgado denied that Ndundalulengo had told him that he would evict him from the property if he did not stop drinking, and he testified that the only concern Ndundalulengo expressed about Salgado's drinking was the effect it was having on Salgado's weight gain.

After Salgado's testimony finished, the trial court and counsel held a second discussion regarding the scope of testimony that the prosecutor would be permitted to elicit from Ndundalulengo on the subject of Salgado's drinking. After noting that Salgado had just *denied* that Ndundalulengo threatened to evict Salgado if he did not stop drinking, the trial court asked the prosecutor to describe her proposed examination of Ndundalulengo. At first, the prosecutor stated that she intended to go into some of the

20

details of the incident that caused Ndundalulengo to tell Salgado to stop drinking.[5]

Defense counsel's *only* objection to the prosecutor's planned questioning of Ndundalulengo was that it would be improper for the prosecutor to go into the *details* of Salgado's behavior because those details were not relevant to any issue in dispute. After observing that she was unsure about how much of the incident Ndundalulengo *personally* witnessed and how much was recounted to him by his wife, the prosecutor decided that she would *not* go into details of the incident, and would only seek to elicit testimony from Ndundalulengo that he perceived Salgado to be out of control when drunk and thus told Salgado he would evict him if he did not stop drinking. The trial court suggested that the prosecutor accomplish that limited questioning by simply asking leading questions of Ndundalulengo and speaking with Ndundalulengo beforehand to instruct him to avoid describing the details of incident. Defense counsel made no objection to that approach, stating "I think she should be allowed to lead it and really fine tune it so it doesn't open the door." During Ndundalulengo's testimony, the prosecutor asked limited leading questions as planned, and defense counsel made no objection.

On appeal, Salgado argues that even the *limited* testimony elicited from Ndundalulengo about Salgado's drinking was irrelevant and should not have been admitted. However, to preserve a claim of erroneous admission of evidence for appeal, a party must make a timely and specific objection at trial. Specifically, "Evidence Code

---

5    According to the prosecutor's offer of proof, the details of the incident were that, while drunk, Salgado appeared at Ndundalulengo's door wearing underwear and holding a knife. Salgado asked Ndundalulengo to drive him to his brother's house to see if his brother was okay, and when they got there Salgado tried to scale the fence.

section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.' Pursuant to this statute, ' "we have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable," ' " and the defendant forfeits his appellate arguments based on the erroneous admission of the evidence.  (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20-21.)  Here, defense counsel did not object during the limited testimony elicited from Ndundalulengo, and his only objection beforehand was to the relevancy of the *details* of the incident, but Ndundalulengo's testimony did not include any of the details of the incident.  Indeed, with defense counsel's concurrence, the prosecutor proceeded with very limited leading questions exactly as she described she would do, referring generically to the incident as Salgado being "out of control."  Accordingly, defense counsel did not preserve for appeal the contention that Ndundalulengo's testimony was improperly admitted.

Moreover, even were the argument properly preserved, we would reject it as lacking merit.  Salgado contends that Ndundalulengo's testimony should have been excluded because it was irrelevant to any issue at trial and thus served only to prejudice Salgado by portraying him as a bad person who drinks until he gets out of control.  We disagree.  The entirety of Ndundalulengo's limited testimony on the subject of Salgado's drinking directly *impeached* Salgado's testimony and thus related directly to the issue of Salgado's credibility.  Specifically, Salgado testified that (1) Ndundalulengo never told him that he would evict him if he didn't stop drinking, and (2) Ndundalulengo's only

22

concern with Salgado's drinking was that Salgado was gaining weight. Ndundalulengo's testimony concisely established that (1) Ndundalulengo *did* threaten to evict Salgado if he continued to drink, and (2) Ndundalulengo was concerned about Salgado's drinking because he got out of control, rather than because Salgado was gaining weight.

Further, even if Salgado were to establish that the trial court erred in admitting Ndundalulengo's testimony, Salgado could not establish that the admission of the testimony caused him any prejudice. If anything, Ndundalulengo's testimony *helped* Salgado in developing his main defense of unconsciousness. The gist of Ndundalulengo's testimony was that on a prior occasion Salgado drank to a point where he got out of control and experienced an alcoholic blackout. As we have explained, Salgado's main defense theory was that he committed the killing while out of control and unconscious due to an alcoholic blackout. Ndundalulengo's testimony *advanced* that defense because it lent credibility to Salgado's claim that, consistent with past experience, he was actually experiencing an alcoholic blackout on the night of the killing, not just feigning a lack of memory.

D.    *Salgado's Prosecutorial Misconduct Argument*

Finally, we consider Salgado's argument that the prosecutor committed prejudicial misconduct during closing argument in referring to Salgado's theory of involuntary manslaughter based on voluntarily intoxication causing unconsciousness as an "accident" theory.

The following specific statements made by the prosecutor during rebuttal closing argument are at issue:

23

"This was not an accident. This is what we heard yesterday afternoon. It was an accident. Ignoring the evidence, turning away from the evidence. This is not an accident. The defendant wants you to believe it was an accident. Wants you to believe: Listen to me and listen to me alone. When I got up on that stand and I said I was unconscious, listen to me. Ignore the evidence. Forget the other evidence. Listen to me, me alone and my doctor. This was not an accident. What he did was murder."

"This is murder. It is not an accident. I want to talk to you specifically about this accident instruction. It's CALCRIM [No. ]626. And it's where he got this 'unconscious.' When the defendant got up there and uttered that word and that word alone, that's why we're talking about this law here. And I'm going to tell you why this law is not a reasonable interpretation based on the evidence in the case.

"Four elements if you want to think . . . -- this was an accident. This is the type of law where it says: Defendant, we understand you didn't have malice. We understand due to your intoxication level you couldn't have done what you did. We understand it's an accident what you did. This defendant pummeled Graham Downes's head over and over and over again. That's not an accident. And the law tells you that's not an accident, because you have to find he did an act with an intent to kill and you have to find that he did not act with a conscious disregard for life [*sic*]. Was he aware? Did he know what he was doing? Yes he did. He was not in an unconscious state. He was conscious."

Salgado also objects to statements later in the prosecutor's rebuttal argument, in which she gave two examples of the type of killing that would constitute involuntary manslaughter under a theory of voluntary intoxication, once again mentioning the idea that such a killing would constitute an "accident."

"You know what an accident is under [CALCRIM No. ]626? It's when a woman comes home so intoxicated, gets into bed and her infant child is there, and she rolls over and she kills her own kid. The law says we understand. You didn't have that killing state of mind. You didn't have that malice. We understand when you rolled over in bed and you suffocated your child as your body weight laid on — lie on your child. We get it. You didn't have malice. This is different. This is different.

24

"Or it's the situation where a drunken man who can barely walk and he goes up into a fire area with ignition stuff and he pees on it and it sets fire and he mistakes it for a urinal and it gets on fire and he ends up killing someone. He was in a stupor. He didn't know. He couldn't appreciate his own conduct. Then the law says we understand. We understand you couldn't form that malice. You couldn't consciously disregard another person's life."

Defense counsel made no objection to these statements during trial. Salgado argues for the first time on appeal that the prosecutor's statements constituted prosecutorial misconduct because they improperly gave the impression that a finding of involuntary manslaughter due to alcohol-induced unconsciousness would amount to a finding that the killing was merely an *accident*, constituting an excusable homicide for which Salgado was not personally accountable. Salgado contends that the prosecutor's comments confused *ordinary* negligence, which occurs in connection with an accident, with *criminal* negligence, which is at issue in an involuntary manslaughter verdict. Further, Salgado contends that the prosecutor's examples of involuntary manslaughter due to voluntary intoxication were improper because they did not describe acts that were inherently dangerous to human life and thus gave the impression that involuntary manslaughter did not constitute *criminal* negligence.

1.      *Defense Counsel Forfeited the Issue by Failing to Object at Trial*

Prosecutorial misconduct exists " 'under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*Earp*, *supra*, 20 Cal.4th at p. 858.) In more extreme cases, a defendant's federal due process rights are violated when a prosecutor's improper remark " ' " 'infect[s] the trial with unfairness,' " ' " making it fundamentally unfair. (*Ibid.*) However, " '[t]o

25

preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition . . . .' " (*Ibid.*)  As an exception to this rule, "[a] defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile.  [Citations.]  In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' "  (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

Here, defense counsel did not object to the statements that Salgado now claims to constitute prosecutorial misconduct, and nothing in the record suggests that an objection would have been futile.  Further, if defense counsel had objected and asked for an admonition, the jury could have been admonished to disregard the prosecutor's alleged misstatements.  Accordingly, we conclude that because defense counsel did not object to the statements that Salgado now assigns as prosecutorial misconduct, the issue is not preserved for appeal.

2.      *Salgado Has Not Established Ineffective Assistance of Counsel*

Salgado contends that defense counsel's failure to object to the alleged prosecutorial misconduct at trial — and thus preserve the issue for appeal — constituted ineffective assistance of counsel.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel."  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)  That right "entitles the defendant not to some bare assistance but rather to *effective* assistance."

26

(*Ibid.*)  A defendant claiming ineffective assistance of counsel has the burden to show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *Ledesma*, at pp. 216, 218.)  Prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Strickland*, at p. 694.)

Further, as is important here, "[r]eviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions." (*People v. Lucas* (1995) 12 Cal.4th 415, 442; see *People v. Anderson* (2001) 25 Cal.4th 543, 569.)  "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions."  (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.  The appellate record, however, rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an

27

evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.)

Here, the appellate record does not show the reason for counsel's failure to object during closing argument. To decide Salgado's contention on direct appeal would require us to speculate as to the reason counsel failed to act. (*People v. Diaz* (1992) 3 Cal.4th 495, 557 ["To engage in . . . speculations [about counsel's failure to act] would involve the reviewing court ' "in the perilous process of second-guessing." ' "].) Further, we are not able to conclude that "there simply could be no satisfactory explanation" for defense counsel's decision not to interrupt closing argument to interpose an objection. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) Defense counsel may have determined that the main impact of an objection would be to draw more attention to the point that the prosecutor was trying to make, namely that Salgado engaged in a prolonged and brutal course of conduct that is difficult to harmonize with the idea that Salgado acted without volition and in an unconsciousness state. In light of that risk, defense counsel could reasonably have concluded that it was best to rely on the jury's ability to follow the clear instruction on finding involuntary manslaughter based on unconsciousness caused by voluntary intoxication rather than interrupting the prosecutor's argument to interpose an objection.

Therefore, we reject, in the context of Salgado's direct appeal, the contention that defense counsel's failure to object to the alleged prosecutorial misconduct constituted ineffective assistance of counsel.

DISPOSITION

The judgment is affirmed.


                                                                    IRION, J.

WE CONCUR:


McDONALD, Acting P. J.


AARON, J.